# EXHIBIT 2

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

*Lair et al. v. Gallik et al.*
Case No. _____

Verified Complaint, Exhibit 2

BEFORE THE COMMISSIONER OF

POLITICAL PRACTICES

_____

| | | |
|---|---|---|
| In the Matter of the Complaint | ) | **SUMMARY OF FACTS** |
| Against Western Tradition | ) | **AND** |
| Partnership and Coalition for | ) | **STATEMENT OF FINDINGS** |
| Energy and the Environment | ) | |

_____

   Benjamin R. Graybill filed complaints against Western Tradition Partnership (WTP) and the Coalition for Energy and the Environment (CEE), alleging that a flyer produced and distributed by one or both of the groups failed to include proper "paid for by. . ." attribution language, in violation of Montana campaign finance and practices laws. The complaint against WTP also alleges that the person responsible for the flyer failed to provide public disclosure by registering and filing campaign finance reports with the office of the Commissioner of Political Practices (CPP).

## SUMMARY OF FACTS

1.   Brad Hamlett was a candidate for Senate District 10 in 2008, running as a Democrat. He defeated his opponent in the election, Republican Jim Whitaker.

2.   Graybill filed a complaint in October 2008, attaching the flyer reproduced on the following page, which he alleged was not in compliance with § 13-35-225(1), MCA.

3.   § 13-35-225(1), MCA requires identification of the person who paid for campaign materials. In the case of a political committee, the attribution must include the language "paid for by" and disclose the name of the committee treasurer. Graybill's complaint alleges that the attribution language on the Hamlett flyer is deficient in both respects – it fails to include "paid for by" language and fails to identify the treasurer.

**Brad Hamlett Flyer** (Exhibit 1; reduced to fit)

Front



Back



Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 2 of 43

4.   The front page of the flyer states:  "Coalition for Energy and the Environment, a project of Western Tradition Partnership," and includes an address with a post office box in Bozeman, Montana.

5.   On November 10, 2008, CPP received the following letter from CEE, signed by Brian Witt, CEE's Treasurer:  **(Exhibit 2)**



Coalition for Energy and the Environment

November 6, 2008

RECEIVED
COMMISSIONER OF
POLITICAL PRACTICES
NOV 10   A 10:44

Dear Political Practices,

Because of a several printing mistakes, we are submitting the following corrections:

1.   The "Paid for by" portions of the "Doc Woerner Tax", Perry Miller Tax, and Dennis Getz Tax mailers were left off along with the name of the treasurer. It should read "Paid for by Coalition for Energy and the Environment."

2.   The "Paid for by" and treasurer name was left off of the Brad Hamlett/MCV mailer.  It should read "Paid for by Coalition for Energy and the Environment, Brian Witt, Treasurer."

3.   The words "Paid for by" are missing from the Holm/MCV, Beck/MCV, Hiner/Tax, McChesney/Environment, Grinde/Environment, Clark/Environment, and Steenson/MCV mailers. It should read "Paid for by Coalition for Energy and the Environment."

4.   The words "Paid for by" were left off of the Moss/Environment mailer.  It should read "Paid for by Coalition for Energy and the Environment."  In addition, the wording on the back should read "Voting to hike taxes and fees by $1.2 billion, strangling Montana's small business, HB 2, 2007 Special Session."  The words "Special Session" were accidentally omitted.

Thank you,

*Brian Witt*

Brian Witt

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 3 of 43

6.  CEE provided CPP copies of other flyers that were distributed during the 2008 campaign year. They are reduced (from the original 5.75" x 10.75") and reproduced on the following pages.

**Paul Clark Flyer** (Exhibit 3)

Front



Back



Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 4 of 43

**Dennis Getz Flyer** (Exhibit 4)

Front



Back



Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 5 of 43

**Cynthia Hiner Flyer** (Exhibit 5)

Front



Back



Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 6 of 43

**Michael Holm Flyer** (Exhibit 6)

Front



Back



Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 7 of 43

**Doc Woerner Flyer** (Exhibit 7)

Front



Back



Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 8 of 43

**Paul Beck Flyer** (Exhibit 8)

Front



Back



Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 9 of 43

**Bill McChesney Flyer** (Exhibit 9)

Front



Back



Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 10 of 43

**<u>Linda Moss Flyer</u> (Exhibit 10)**

Front



Back



Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 11 of 43

**Cheryl Steenson Flyer** (Exhibit 11)

Front



Back



Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 12 of 43

7. In addition to the Brad Hamlett flyer, a copy of which is reproduced on page 2 (Exhibit 1), another attack mailer directed at Hamlett was distributed around the same time that contained similar images and statements.

8. According to Brian Witt, Christian LeFer forwarded a draft of the Brad Hamlett flyer to him on October 22, 2008. (See Fact 61.)

9. Paul Clark was a candidate for Senate District 7 in 2008, running as a Democrat. (Exhibit 3.) He lost to his opponent in the election, Republican Greg Hinkle.

10. Dennis Getz was a candidate for House District 38 in 2008, running as a Democrat. (Exhibit 4.) He defeated his opponent in the election, Republican Patricia Banister.

11. Cynthia Hiner was a candidate in House District 85 in 2008, running as a Democrat. (Exhibit 5.) She defeated her opponent in the election, Republican BJ Schubert.

12. Michael Holm was a candidate in House District 3 in 2008, running as a Democrat. (Exhibit 6.) He lost to his opponent in the election, Republican Dee Brown.

13. Doc Woerner was a candidate in House District 58 in 2008, running as a Democrat. (Exhibit 7.) He lost to his opponent in the election, Republican Krayton Kerns.

14. Paul Beck was a candidate in House District 59 in 2008, running as a Democrat. (Exhibit 8.) He defeated his opponent in the election, Republican Scott Boggio.

15. Bill McChesney was a candidate in House District 40 in 2008, running as a Democrat. (Exhibit 9.) He defeated his opponent in the election, Republican Jeff Harding.

16. Lynda Moss was a candidate in Senate District 26 in 2008, running as a Democrat. (Exhibit 10.) She defeated her opponent in the election, Republican Max Graham.

17. Cheryl Steenson was a candidate in House District 8 in 2008, running as a Democrat. (Exhibit 11.) She defeated her opponent in the election, Republican Craig Witte.

18. § 13-35-225(3), MCA requires that printed material that references candidate voting records must include certain specified information. Four of the fliers reference candidate voting records. One, against Cynthia Hiner (Exhibit 5.), did not reference the bill, date of vote, or contrasting vote required by the statute. Three (Exhibits 3, 9, and 10) do not reference dates or contrasting votes required by the statute.

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 13 of 43

19.  In a December 16, 2008 letter responding to Graybill's complaints, Dan Reed, then-Executive Director of WTP, stated that WTP is a Colorado non-profit corporation organized and registered with the Internal Revenue Service (IRS) as a 501(c)(4) organization. Reed contends the Hamlett flyer was paid for by CEE, a political action committee (PAC) and that "WTP does not control, fund, or purport to speak for any PAC." Reed states:

> "As a non-partisan, non-profit organization which does not make and has not made expenditures regulated under any of the statutes cited by Mr. Graybill, our organization is not under the jurisdiction of the Office of Political Practices of Montana."

20.  In a December 19, 2008 letter responding to Graybill's complaints, Brian Witt, Treasurer of CEE, states that "[w]hen the error pertaining to the 'paid for by' and the name of the treasurer were first spotted a corrected version was mailed to [CPP]." The letter from Witt also states that CEE paid for the Hamlett flyer, and that CEE's income and expenditures are "completely separate" from WTP. The letter states that "[o]ther than tactical and strategic discussions, the groups [WTP and CEE] conduct business as distinct entities."

21.  An article published in the Helena Independent Record on May 4, 2008, states that WTP was founded by former Montana legislator John Sinrud and former U.S. Congressman Ron Marlenee. The article notes that WTP has ties with the Montana right-to-work movement, naming Christian LeFer (See Fact 9.) According to the article, Sinrud claimed that WTP is a separate group, and that LeFer was just working as a consultant to WTP. The mission statement on WTP's website states:  "Western Tradition Partnership is a 501(c)(4) grassroots lobbying organization dedicated to fighting environmental extremism and promoting responsible development and management of land, water, and natural resources in the Rocky Mountain West and across the United States."

22.  According to information on the IRS website, a 501(c) organization is a tax-exempt organization established under section 501(c) of the Internal Revenue Code. A 501(c)(4) organization is typically a "social welfare organization", which the IRS describes as "civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare." A 501(c)(4) organization may further

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 14 of 43

its purposes through lobbying for passage of legislation. According to the IRS, "The promotion of social welfare does not include direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." (26 C.F.R. 1.501(c)(4)–1(a)(2)(ii))

23.   Christian LeFer is the Executive Director of Montana Citizens for Right to Work, a corporation registered with the Montana Secretary of State. The mission statement on its website states: "To pass legislation which prohibits forcing workers to pay union dues as a condition of employment."

24.   Public records show WTP is registered as a nonprofit corporation in Colorado. WTP's articles of incorporation were filed in Colorado by Scott Shires on March 31, 2008, listing a principal office street address of 12237 East Amherst Circle, Aurora, Colorado. Articles of Amendment for WTP were filed in Colorado by John Thomas Snow on June 26, 2008, listing an address of 1601 Blake Street, Denver, Colorado. WTP is also registered with the Montana Secretary of State as a public benefit corporation, listing its principal office address as 1601 Blake Street, Denver, Colorado.

25.   On June 11, 2008, CEE filed a Statement of Organization (Form C-2) with CPP as a political action committee (PAC). Fawn Kirkpatrick, who at the time was a student at Montana State University - Bozeman, was listed as the Treasurer. The purpose of the committee listed on the statement is "Elect pro-candidates for a balanced energy portfolio."

26.   According to a notice (Form 8871) filed with the IRS on September 29, 2008, CEE is organized as a 527 political organization. Information on the IRS website provides that a 527 organization is a party, committee, association, fund, or other organization organized and operated primarily for the purpose of accepting contributions or making expenditures to influence the nomination or election of individuals to public office.

27.   The form 8871 filed by CEE, under Part IV, "Notice of 527 status," names WTP as a related, affiliated entity, and lists Scott Shires as the "manager" of CEE and as the individual who filled out the form.

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 15 of 43

28. On May 15, 2009, CEE filed an IRS form 990-EZ tax return. The form, signed by Scott Shires as Treasurer, states that CEE did not receive any contributions and had no expenses for the 2008 tax year.

29. Forms 990-EZ and 990 are tax return forms for organizations exempt from income tax, including 501(c) and 527 organizations.

30. On March 8, 2010, WTP filed an IRS form 990 tax return for the 2008 tax year. In section C at the top of the return, "Western Tradition Partnership" is typed in as the name of the organization, and "Coalition for Energy and the Environment" is hand-written above it. The form 990 lists total contributions for the 2008 tax year of $665,725, and total expenses of $662,415.

31. On May 18, 2010, the IRS 527 organization known as Coalition for Energy and Environment renamed itself Western Tradition Partnership. CEE and WTP both have the same federal employment identification number (FEIN).

32. On May 20, 2010, Attorney James Brown of the firm Doney, Crowley, Bloomquist, Payne, Uda, PC of Helena wrote to inform CPP that he was representing WTP in both the complaint against WTP and the complaint against CEE. In response to CPP's subsequent request for clarification, Brown submitted a letter from Donny Ferguson, WTP's "National Director of Media & Public Relations", in which Ferguson states that Brown represents the Coalition for Energy and Environment. Art Wittich (Bozeman attorney and legislative candidate) represents WTP in a lawsuit challenging a Montana campaign statute, Ferguson said. Brown again asserted that he represented WTP in the Graybill complaints and asked that the complaints be consolidated. On June 3, 2010, CPP asked again that Brown clarify who he represents, noting that the letter from Ferguson indicates only that Brown represents CEE, and WTP has denied controlling, funding or speaking "for any PAC." (Fact 5.) Brown's reply included another letter from Ferguson, this one asserting that Brown represents WTP "in the matter of the complaint filed by Benjamin Graybill and in all matters concerning WTP. . ." In a subsequent letter dated August 5, 2010, Brown reiterated the assertion that WTP was not responsible for the CEE flyer at issue. (Fact 2, Exhibit 1.)

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 16 of 43

33. On or about June 20, 2010, Brown contacted CPP in regard to an unrelated matter and stated that he is serving as general counsel for the Montana Republican Party.

34. The Colorado League of Taxpayers (CLT) was formed as a Colorado nonprofit corporation on July 26, 2006 by Scott Shires. Shires is the same person who filed WTP's articles of incorporation in Colorado (Fact 24), was listed on IRS form 8871 filed by CEE as CEE's "manager" (Fact 27), and signed, as Treasurer, CEE's federal tax return (on form 990 EZ) for the 2008 tax year (Fact 28).

35. An agency decision issued by an administrative law judge for the Colorado office of the Secretary of State on April 24, 2009 found that the CLT violated the reporting requirements of Colorado law by failing to file a report of its electioneering activities in 2008 opposing the election of Steve Carter for the office of Garfield County Commissioner in Colorado. The decision found that CLT had spent, and failed to report, nearly $2,400 for production and mailing of two flyers opposing Carter's candidacy. The agency decision imposed a penalty of $7,150 against CLT for the violation.

36. The flyer opposing Steve Carter had the same format and layout, and much of the same text, as the Cynthia Hiner "Making Taxpayers Howl" flyer reproduced in Fact 6 (Exhibit 5). The check used to pay for the Carter flyer listed a Livingston, Montana post office box number. Investigation in the instant complaint determined that the mailing address in Livingston is associated with Christian LeFer and the signature on the check appears to be LeFer's. That Flyer is reduced and reproduced on the following page.

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 17 of 43

**Steve Carter Flyer** (Exhibit 12)

Front



(Back)



37.    CEE filed an original Political Committee Finance Report (Form C-6) with CPP on June

23, 2008. The report covered the reporting period from May 18 to June 18, 2008. The

report listed MSU student Fawn Kirkpatrick as Treasurer (see Fact 25), but was not

signed. CPP staff members were unable to contact Kirkpatrick – her email and

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 18 of 43

telephone contact information listed on the previously filed Statement of Organization (Form C-2) was found to be incorrect. The report listed:

- – a $2,000 contribution from treasurer Fawn Kirkpatrick and
- – a $2,250 contribution from John Sinrud.

The report also listed an independent expenditure, but the itemization of the details of the expenditure required by 44.10.531(4), ARM was not included.

38. CEE filed an amended Form C-6 Financial Report on July 2, 2008, covering the same reporting period. The amended report listed three independent expenditures totaling $3,558.52 made to Red Phone Communications, a business with an address in Fort Collins Colorado. The purpose of the three expenditures was described as "consulting and mail services," and in a column titled "candidate/issue," CEE listed:

- – Bruce Malcolm, of Emigrant
- – John Ward, of Helena, and
- – Carol Lambert, of Broadus.

Each of these incumbent Republican legislators were defeated in the June primary election, targets of late campaign mailers sent by previously unknown groups.

39. The forms submitted in June and July 2008 and referenced in Facts 37 – 38 were either not signed, or the signatures were illegible. In addition, signatures on the initial Form C-2 and the original and amended Form C-6 do not appear to match each other, even though each of the forms lists Fawn Kirkpatrick as the treasurer and each of the forms require that the treasurer certify the information in accordance with Montana campaign law. Further, the text of the certification statement has been altered from the forms provided by CPP, deleting the phrase "and correct."

40. A business known as Red Phone Consulting filed articles of organization as a limited liability company with the Colorado Secretary of State on March 10, 2006, naming Jacob Leis as the registered agent. As of March 19, 2010, the WTP website listed Jacob Leis as its Executive Director. By May 26, 2010, Leis's name had been removed from the contact page on the WTP website. Donald Ferguson is currently listed on the website as WTP's Executive Director.

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 19 of 43

41.  CEE's amended report described in Fact 38 also reports a $160 expenditure to Joel Boniek for the general election, and a $160 expenditure to Greg Hinkle for the primary election. The purpose of the two expenditures was described as "campaign candidate support."

42.  In 2008, Boniek defeated Republican incumbent Bruce Malcolm in the primary election and ran unopposed as the Republican candidate in House District 61. Hinkle, a Republican, defeated Sylvia Bookout-Reinicke in the Senate District 7 primary election, and went on to defeat Democratic candidate Paul Clark in the general election. (See Fact 9.)

43.  CEE filed a finance report (Form C-6) on October 23, 2008, covering the period from June 19 to October 18, 2008. The report was designated as an amended report, but CPP records disclosed no other finance reports for this time period. Although the report lists Fawn Kirkpatrick as Treasurer, the report is not signed. No contributions are reported, and only $20 in expenditures for bank fees.

44.  CEE submitted to CPP an unsigned amended Statement of Organization (Form C-2) on November 3, 2008, changing the mailing address of the committee and changing the name of the committee Treasurer to Brian Witt. The form was e-mailed to CPP, but a signed hard copy was never subsequently filed. When questioned, Witt stated he did not recall sending the form (C-2) to CPP. He does not believe he created it, he said, and he never signed the document.

45.  CEE filed a Political Committee Finance Report (Form C-6) on December 8, 2008, reporting on the period from October 19 to November 19, 2008. The report was designated as an amended report, but CPP records disclosed no other C-6 report for this time period. Although the report lists Fawn Kirkpatrick as Treasurer, it is signed by Brian Witt. Individual contributions of $4,000 from Dan Reed (Executive Director of WTP at the time) and $3,000 from John Sinrud are reported. The C-6 form also includes two rebates or refunds – one from Hinkle for Senate in the amount of $160, and one from Red Phone Consulting in the amount of $479.50. Two expenditures are reported – one to Red Phone Consulting in the amount of $7,725.13 for "consulting and mail services" and one to Wells Fargo in the amount of $5.

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 20 of 43

46.   CEE filed a finance report (Form C-6) on February 11, 2009, covering the period from November 20 to December 31, 2008. CEE designated this report as its closing report. The report was designated as an amended report, but CPP records disclosed no other Form C-6 finance report for this time period. Although the report lists Fawn Kirkpatrick as Treasurer, it is signed by Brian Witt. No contributions are listed for the reporting period and three expenditures – two $5 expenditures to Wells Fargo Bank for bank fees and one expenditure of $90.85 described as a return of excess contributions to Dan Reed. Based on these transactions, the C-6 reports that no cash remained in CEE's bank account at the end of the reporting period.

47.   Following an interview with Christian LeFer (see Facts 21 and 23), Karolin Loendorf was offered a job with WTP and began working there on January 7, 2009. Loendorf stated she understood her responsibilities would include getting individuals elected to public office. Loendorf resigned from WTP on February 15, 2009, based on what she described as "underhanded things" going on at WTP.

48.   According to Loendorf, some presently serving Montana legislators are affiliated with WTP. Loendorf contends that if the legislators fail to support WTP's favored legislation, WTP will attempt to replace them in the next election.

49.   Loendorf contends that WTP has formed several 501(c)(3) and 501(c)(4) affiliated organizations, as well as a political action committee (PAC). According to Loendorf, if donors were uncomfortable contributing money to a PAC, they could donate to the affiliated nonprofit organizations while keeping their contributions confidential.

50.   Loendorf provided a copy of the "WTP 2010 Election Year Program Executive Briefing," designed as a PowerPoint presentation, which appears to be targeted to Montana donors (hereinafter "Montana presentation"). Loendorf also provided a copy of a second PowerPoint presentation entitled "WTP 2010 Election Year Program U.S. House and Senate" (hereinafter "Federal presentation"). According to Loendorf, both PowerPoint presentations were intended to be presented by WTP in "private executive briefings" made to potential donors.

51.   The Montana presentation lists 2008 "target states," Montana and Colorado, and lists "targeted primary races" in Montana. One page of the Montana presentation is entitled "2008 Election Results" and lists the following claims for 2008 Montana elections:

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 21 of 43

- "Pro-responsible growth candidates win 14 of 19 targeted races"
- "Majority of Republican candidates pledge 100% support for responsible growth policies"
- "Republicans take control of State Senate"

52. The Montana presentation projects amounts of money to be spent in 2010 on Montana primary and general election races, including $77,000 for the "Primary Program" and $460,000 for the "General Election Program," for a total cost of $537,000.

53. The Federal presentation lists 16 target Senate races and 30 target House races, with a total projected cost of $8,287,500.

54. Both presentations claim the following "Advantages of Supporting the Program":

- "It works"
- "It's about the issues"
- "Corporate contributions allowed"
- "No contribution limit"
- "It's confidential"

Notes accompanying the Montana presentation include the following statements:

- "Corporate contributions are completely legal under this program."
- "There's no limit to how much you can give."
- "As you know, Montana has very strict limits on contributions to candidates but there is no limit to how much you give to this program."
- "You can give whatever you're comfortable with and make as big an impact as you wish."
- "Finally, we're not required to report the name or the amount of any contribution that we receive."
- "So, if you decide to support this program, no politician, no bureaucrat, and no radical environmentalist will ever know you helped make this program possible."
- "The only thing we plan on reporting is our success to contributors like you who can see the benefits of a program like this."
- "You can just sit back on election night and see what a difference you've made."

55. The Montana presentation also includes examples of campaign materials under the "General Election Program" section, including another flyer opposing Colorado candidate Steve Carter (see Fact 36), reduced from the original and reproduced here.

**Steve Carter Flyer** (Exhibit 13)

Front



Back



Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 23 of 43

The Steve Carter flyer has the same format and layout as the flyers attacking Brad Hamlett, Dennis Getz, Michael Holm, Doc Woerner, Paul Beck, and Cheryl Steenson. (See Facts 2 and 6, Exhibits 1, 4, 6, 7, 8, and 11.)

56. Loendorf provided a file named "Missoula Donor List," which appears to have been taken from a Missoula campaign finance list or database. Donor names with associated contributions to past candidates and political parties are listed, with contact information. Another file named "Beaverhead County Donors" listed 97 potential donors from Beaverhead County.

57. Loendorf also provided copies of WTP letters to potential donors, which include the following statements (emphasis in original):

> . . .
>
> "I've seen WTP completely change the political climate where they decide to get involved. They make a habit of defeating special interests who use "environmentalism" as a cover for political attacks on business.
>
> . . .
>
> We're lining up our target districts for 2010 right now.
>
> Make no mistake. The opportunity is before us. The dynamics have never been more in our favor. Americans are ready to take our nation back from the radical anti-business Left, but they can't do that if the 'wolves in sheep's clothing' aren't exposed for what they really are.
>
> And that is exactly what we're going to do at Western Tradition Partnership."

58. CPP's investigator found evidence that as part of their solicitation of donors, WTP intended or attempted to solicit donations from officers of several foreign corporations, including corporations based in Canada, South Africa, and the United Kingdom.

59. Brian Witt, who was designated as CEE's Treasurer during the time the flyers described in Fact 6 were distributed to voters, was formally asked in a letter mailed by CPP on May 7, 2010 to provide financial information regarding the activity that was the subject of the complaint, as provided for in § 13-37-208, MCA.

60. In a phone interview with a CPP investigator, Witt stated he was a student at MSU-Bozeman and spoke to a friend about becoming active in politics. The friend introduced Witt to Christian LeFer, who convinced Witt to become Treasurer of CEE. According to Witt, LeFer told him it would "look great" on his resume, and he wouldn't have to do

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 24 of 43

anything – that LeFer would prepare all the necessary reports for Witt's signature. Witt claims he only signed reports and correspondence that were prepared by others and submitted to him. He was not involved in compiling the reports or drafting the correspondence, he said. Following the interview, Witt submitted the following letter to CPP explaining his limited role in CEE:  **(Exhibit 14)**

---

**POSTMARKED**

**MAY 1 7 2010**

May 17, 2010

Dear Rob Hoffman,

        In regards to your letter dated May 7, 2010 I will answer the complaint against the Coalition for Energy and Environment by Benjamin Graybill on November 3, 2008 in the following manner:

1.)     I have not in my possession, to date, nor at any time previously, ever had information in regards to "Any and all contracts, or other agreements, bills or invoices, records of payment and receipts, copies of checks for payments that relate to the campaign mailers the Coalition for Energy and Environment purchased and distributed in opposition" to any of 11 candidates you have listed.

2.)     At no point did I ever posses a check book nor write a check for any activity involving C.E.E. nor did I ever receive any form of compensation from C.E.E either monetarily or otherwise.

3.)     At no point in time did I ever have a key to access the Post Office Box 11894 Bozeman, MT 59715. I have no concrete knowledge of who opened up that box with the Post Office or who obtained the mail from that box whether on a regular or irregular basis.

4.)     The copy of the letter dated November 6,th 2008 I did not personally prepare and I never personally received the documents that the four corrections allude to.

5.)     The copy of the letter addressed to Commissioner Unsworth was not prepared by me and I am certain of that beyond all reasonable doubt. I am not certain of whether or not it was sent to me by mail, email or delivered to me in person

6.)     In regards to the C-2 report there is a bank account at Wells Fargo on 211 W. Main Street, Bozeman, MT, 59718 that is listed. I did not open any such account at Wells Fargo nor did I ever write checks from that account nor make any deposits to that account. I do not have concrete knowledge as to who the signatory for that account is/was.

7.)     In regards to the three copies of the C-6 forms: The cash summaries were not completed by me as I stated above about not having access to any bank account(s). They were delivered to me and I was told to sign them.

Sincerely,

Brian O. Witt

Brian O. Witt

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 25 of 43

61.  Witt also provided copies of email exchanges between him and Christian LeFer which establish that LeFer was affiliated with and closely involved in the activities of WTP and CEE.

   – An October 5, 2008 email from LeFer directs Witt to contact CPP and "find out what it takes to switch a treasurer . . ."

   – An October 6, 2008 email discusses the submission of an amended campaign finance form to CPP.

   – An October 22, 2008 email from LeFer to Witt includes as an attachment an attack mailer that was sent out against Brad Hamlett. (See Fact 2, Exhibit 1.)

   – A November 26, 2008 email from Allison LeFer (see Fact 62) to Witt states: "I have had the guy who handles PAC filings compile yours. I wanted to get them to you for your signature so you can drop them off in the mail."

   – An email from Christian LeFer to Witt dated December 17, 2008, includes as an attachment a letter to CPP from Witt responding to the complaint filed against WTP and CEE. The email instructed Witt to sign the letter and fax it to CPP, followed with a hard copy to CPP.

62.  Christian LeFer and his wife, Allison LeFer (formerly Allison Andrew) operate a print shop that provides political campaign printing services to candidates in Montana, Colorado, and possibly other states.

63.  Direct Mail and Communications (DMC) is registered with the office of the Montana Secretary of State as a general business corporation. DMC's principle office address is listed as 12237 East Amherst Circle, Aurora, Colorado. This is the same Colorado address listed by Scott Shires as WTP's initial principal business address (Fact 10). DMC's website lists Allison Andrew (LeFer) as its contact person.

64.  CPP records show that at least nine candidates for the Montana Legislature used the services of DMC for campaign printing in 2008:  Pat Banister, Jerry Bennett, Scott Boggio, Joel Boniek, Greg Hinkle, Doug Kary, Mike Miller, Wendy Warburton, and Jim Whitaker. Four of those candidates (Banister, Boggio, Hinkle, and Whitaker), ran against candidates who were the subjects of the campaign flyers produced and distributed by WTP and CEE and discussed in this decision. (See Facts 1 and 2, and Exhibit 1 – Whitaker ran against Hamlett; Facts 6 and 9, and Exhibit 3 – Hinkle ran against Clark; Facts 6 and 10, and Exhibit 4 – Banister ran against Getz; and Facts 6 and 14, and Exhibit 8 – Boggio ran against Beck.)

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 26 of 43

65. Jennifer Paul, who was identified as an employee of WTP, is the Treasurer of an organization known as Mothers Against Child Predators. The group mailed a flyer attacking the candidacy of Bruce Malcolm in House District 41 and John Ward in House District 84. Based on the candidate's alleged past support of legislation that would have ended capital punishment in Montana, the flyer alleged they were "soft on crime" and sought to associate them with serial killers, concluding "Montana can't afford weak politicians when it comes to crime." The format and layout of the flyers appear similar to flyers produced by WTP and CEE, and the races involve two of three independent expenditures listed by CEE in a Form C-6 Financial Report on July 2, 2008. (Fact 38.)

66. Hillary Allen is identified through forms and correspondence as the treasurer for several other committees implicated in WTP's activity – the Alliance of Montana Taxpayers, Montana Conservative Victory Fund, and Montana Committee to Protect the Unborn. Correspondence received as recently as March 2010, indicated Allen's involvement with the committees. Requests for interviews and committee records have gone unanswered.

67. Conservative Victory Fund reported on a Form C-6 Financial Report dated November 24, 2008 that it had received nearly $30,000 over the previous 30 days, primarily from the National Right to Work Committee PAC. The committee reported all of the money was spent over that same time-frame:

   –   $18,000 to another PAC, the Alliance of Montana Taxpayers PAC
   –   Nearly $6,000 for postage
   –   $4,300 for consulting to "Rattler, Gadsden."
   –   Contributions to seven legislative candidates

   Miscellaneous minor expenditures constitute the balance of the reported expenditures.

68. Conservative Victory Fund is one of six committees in 2008 that submitted financial disclosure forms that contained altered certification language – certification omitting the words "and correct" from the oath or affirmation statement required by § 13-37-231, MCA. (See, also, Fact 39.) The reports, for Sportsmen's Rights PAC, Mothers Against Child Predators, Alliance of Montana Taxpayers, Conservative Victory Fund, Right to Work PAC, and Committee to Protect the Unborn were each prepared for Christian

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 27 of 43

LeFer by a Helena-based campaign reporting service. LeFer signed checks drawn on a "Montana Citizens for Right to Work, Inc." bank account in payment for the filing service for the six committees (See, also, Fact 39.)

69.   WTP has never filed the required public disclosure statements with CPP – a Statement of Organization (Form C-2) registering as a political committee, and a Political Committee Finance Report (Form C-6).

## STATEMENT OF FINDINGS

The complaint alleges that the Hamlett flyer fails to include proper attribution language in violation of § 13-35-225, MCA. In addition, the complaint alleges that if WTP is responsible for the flyer, the group failed to register as a political committee and file campaign finance reports with CPP.

The complaint does not allege that the expenditures associated with the campaign flyers discussed herein were coordinated with a candidate or a candidate's campaign. Thus far, sufficient evidence has not been disclosed to establish coordination between WTP/CEE and any candidate.

Concern and healthy skepticism is warranted, however. Christian LeFer, who played a central role in the campaign activity described here, has direct involvement with the print shop (Facts 62 and 63) some candidates used (Fact 64) at the same time they likely benefited from WTP's campaign against their opponent (Fact 42.) Jim Brown is legal counsel for both WTP and the Montana Republican Party. (Facts 32 and 33.) I take administrative notice that the communication that occurs between candidates/campaign staff and shared legal counsel and printers offers ample opportunity for exposure and interaction (communication) of the type addressed in the definition of the term "independent expenditure" in 44.10.323(3), ARM. I also note that mailers sent during the current (2010) campaign cycle by WTP bear remarkable resemblance to mailers being sent by their favored candidates, again raising concerns of prohibited coordination.

This nation's courts, beginning with *Buckley, supra,* have long understood the relationship between *quid pro quo* corruption, or the appearance of such corruption, and coordinated expenditures vs. independent expenditures. The majority opinion in *McConnell v. FEC*, 540 U.S. 93, 224 (2003), duly noted that money in politics "will always find an outlet." The McConnell majority upheld the constitutionality of the definition of the term "coordinated expenditure" in the Bipartisan Campaign Reform Act of 2002 (BCRA), declaring that:

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 28 of 43

Independent expenditures "are poor sources of leverage for a spender because they might be duplicative or counterproductive from a candidate's point of view." (*Colorado II*, 533 U.S. at 446….) By contrast, expenditures made after a "wink or nod" often will be "as useful to the candidate as cash." (*Id.*, at 442, 446….) For this reason, Congress has always treated expenditures made "at the request or suggestion of" a candidate as coordinated. [Citations omitted.]

Absent additional evidence, the expenditures at issue in this case will be considered to be "independent expenditures," which by definition are not made with the "cooperation or prior consent of or in consultation with, or at the request or suggestion" of a candidate. (44.10.323(3), ARM.)

Because WTP is a corporation (Fact 10), it is necessary to discuss Montana's laws regulating corporate campaign spending, as well as federal case law ruling on constitutional issues pertaining to corporate expenditures.

Montana's administrative rules do not define the phrase "expressly advocating," thus, it is appropriate to look to federal case law to ensure that enforcement of Montana's law is consistent with constitutional principles. The following discussion is also necessary based on the nature of corporate expenditures as interpreted by the courts.

Courts have held that corporate expenditures not coordinated with a candidate (independent expenditures) can be prohibited if the political message expressly advocates the election or defeat of a clearly identified candidate. (*FEC v. Massachusetts Citizens for Life,* 479 U.S. 238, 249 (1986))

## § 13-35-227, MCA

WTP is a corporation. Prior to discussing the express advocacy standard, it is necessary to briefly address Montana's longstanding restrictions on corporate political spending. For purposes of this discussion, § 13-35-227(1), MCA, provides that a corporation may not make a contribution or expenditure in connection with a candidate, a political committee that supports or opposes a candidate, or a political party. Earlier this year WTP and two other incorporated entities filed a lawsuit in state court against the Attorney General and the Commissioner of Political Practices, contending that the statute's prohibition of independent corporate expenditures is unconstitutional. In a decision issued on October 18, 2010, Judge Jeffrey Sherlock, relying on the United States Supreme Court's recent decision in *Citizens United v. FEC*, 130 S. Ct. 876 (2010), declared that the statute as it pertains to independent corporate expenditures is unconstitutional and unenforceable based on the First Amendment to the United States Constitution. Judge Sherlock's Order permanently enjoins the defendants from enforcing the independent expenditure prohibition in § 13-35-227(1),

MCA. Although Judge Sherlock's decision will likely be appealed to the Montana Supreme Court, at this time the statutory independent corporate expenditure ban may not be enforced against WTP.

## Express Advocacy

The "express advocacy" standard was devised by the United States Supreme Court in *Buckley v. Valeo*, 424 U.S. 1 (1976) to avoid problems of overbreadth in attempts to regulate political speech. The Court narrowly construed the federal statutory definition of "expenditure" to apply, for certain purposes, "only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." (*Buckley* at 44.) The Court recognized that general discussions of issues and candidates are distinguishable from more pointed exhortations to vote for or against particular persons. In a footnote the Court listed examples of express advocacy, which have become known as "magic words," including phrases such as "vote for," "elect," "support," "cast your ballot for," "vote against," "defeat," "reject," etc. (*Buckley* at 44, n. 52.)

Ten years later, in *Federal Election Comm'n v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986) ("*MCFL*"), the Court determined that a communication need not include one or more of the particular phrases listed in *Buckley* to constitute express advocacy, finding that a message that is "marginally less direct" than a "vote for" message, or that "in effect" provides an explicit directive, can be express advocacy. The Supreme Court determined that the "essential nature" of such ads "goes beyond issue discussion to express electoral advocacy." (*MCFL* at 249.)

In *Federal Election Comm'n v. Furgatch*, 807 F.2d 857 (9th Cir. 1987), the Ninth Circuit Court of Appeals considered whether a political advertisement expressly advocated the defeat of President Jimmy Carter in the days before the 1980 presidential election. The Court noted that a "proper understanding of the speaker's message can best be obtained by considering speech as a whole." (*Furgatch* at 863.) Rejecting the use of a "magic words" approach as a test of express advocacy, the Court stated that applying such a test could result in permitting campaign spenders to "remain just beyond the reach of the Act by avoiding certain key words while conveying a message that is unmistakably directed to the election or defeat of a named candidate." (*Furgatch* at 863.) The Court set forth the following test:

> We conclude that speech need not include any of the words listed in *Buckley* to be express advocacy under the Act, but it must, when read as a whole, and with limited reference to external events, be susceptible to no other reasonable interpretation but as an exhortation to vote for or against a specific candidate. (*Furgatch* at 864.)

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 30 of 43

The Court divided this standard into three components:

1) Speech is "express" only if "its message is unmistakable and unambiguous, suggestive of only one plausible meaning."

2) Speech amounts to "advocacy" only "if it presents a clear plea for action," as opposed to being merely informative.

3) It must be clear what action is advocated. If "reasonable minds could differ" regarding whether the speech encourages a vote for or against a candidate, it is not "express advocacy." (*Furgatch* at 864.)

In 1995, the Federal Election Commission (FEC) adopted a regulation defining "expressly advocating" based in large part on standards established by the United States Supreme Court in *Buckley* and the Ninth Circuit in *Furgatch*.

In response to a flood of soft money (political money donated in such a way as to avoid limits and/or disclosure requirements) used to fund issue ads, Congress enacted the Bipartisan Campaign Reform Act of 2002 (BCRA). In enacting Section 203(a) of the BCRA, Congress in effect repudiated the "magic words" test by including regulation of "electioneering communications," defined as any broadcast, cable or satellite communication referring to a clearly identified federal candidate and airing within 30 days of a primary or 60 days of a general election, that targeted the electorate of that candidate. Under the provision, corporations and unions are prohibited from paying for any electioneering communications and any person spending more than $10,000 in a calendar year on electioneering communications must file disclosure reports with the FEC.

In *McConnell v. Federal Election Comm'n*, 540 U.S. 93 (2003), the United States Supreme Court considered a challenge to the BCRA electioneering communications restrictions on broadcast ads. The challenge was based on the argument that "*Buckley* drew a constitutionally mandated line between express advocacy and so-called issue advocacy and that speakers possess an inviolable First Amendment right to engage in the latter category of speech." (*McConnell* at 190.) The Supreme Court rejected the argument that the First Amendment "erects a rigid barrier between express advocacy and so-called issue advocacy," stating that such a notion "cannot be squared with [the Court's] longstanding recognition that the presence or absence of magic words cannot meaningfully distinguish electioneering speech from a true issue ad." (*McConnell* at 193.) The Court ultimately agreed that *Buckley's* magic words requirement was "functionally meaningless," and upheld the BCRA electioneering communications provision against a constitutional challenge, finding that the majority of the ads at issue in the underlying litigation were the "functional equivalent" of express advocacy. (*McConnell* at 193-94, and 206.)

In 2004 Wisconsin Right to Life (WRTL), a corporation broadcast some ads that it believed were not subject to the "electioneering communications" restrictions of the BCRA. WRTL filed a lawsuit against the FEC seeking a declaratory judgment that its ads qualified for an as-applied exemption from the restrictions. The transcript of one of WRTL's radio ads is set forth below:

> PASTOR:  And who gives this woman to be married to this man?
>
> BRIDE'S FATHER:  Well, as father of the bride, I certainly could. But instead, I'd like to share a few tips on how to properly install drywall. Now you put the drywall up . . .
>
> VOICE-OVER:  Sometimes it's just not fair to delay an important decision. But in Washington it's happening. A group of Senators is using the filibuster delay tactic to block federal judicial nominees from a simple "yes" or "no" vote. So qualified candidates don't get a chance to serve.
>
> It's politics at work, causing gridlock and backing up some of our courts to a state of emergency.
>
> Contact Senators Feingold and Kohl and tell them to oppose the filibuster.
>
> Visit:  BeFair.org
>
> Paid for by Wisconsin Right to Life (befair.org), which is responsible for the content of this advertising and not authorized by any candidate or candidate's committee.

The case eventually ended up in the United States Supreme Court, with Chief Justice Roberts writing for the majority that "a court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Wisconsin Right to Life v. Federal Election Comm'n*, 551 U.S. 449, 469-70 (2007) ("*WRTL*"). The Court applied the test to WRTL's ads:

> Under this test, WRTL's three ads are plainly not the functional equivalent of express advocacy. First, their content is consistent with that of a genuine issue ad: The ads focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter. Second, their content lacks indicia of express advocacy: The ads do not mention an election, candidacy, political party, or challenger; and they do not take a position on a candidate's character, qualifications, or fitness for office. (*WRTL* at 470.)

The FEC and intervenors argued that "contextual" factors proved that the ads were the equivalent of express advocacy. They cited evidence that during the same election cycle when the ads ran, WRTL's political action committee actively opposed Senator Feingold's reelection and identified filibusters as a campaign issue. FEC and the intervenors also noted that the ads were to be aired near the time of elections, but not near actual Senate votes on judicial

nominees. The Court considered the extent to which "context" can be
considered under the test it had approved:

> Given the standard we have adopted for determining whether an
> ad is the "functional equivalent" of express advocacy, contextual
> factors of the sort invoked by appellants should seldom play a
> significant role in the inquiry. Courts need not ignore basic
> background information that may be necessary to put an ad in
> context–such as whether an ad "describes a legislative issue that
> is either currently the subject of legislative scrutiny or likely to be
> the subject of such scrutiny in the near future," [citation omitted] –
> but the need to consider such background should not become an
> excuse for discovery or a broader inquiry of the sort we have just
> noted raises First Amendment concerns. (*WRTL* at 473-74.)

In response to Justice Scalia's objection that the test approved by the Court was vague, the
majority opinion noted:

> [W]e agree with Justice Scalia on the imperative for clarity in this area; that is
> why our test affords protection unless an ad is susceptible of *no reasonable
> interpretation* other than as an appeal to vote for or against a specific candidate.
> It is why we emphasize that (1) there can be no free-ranging intent-and-effect
> test; (2) there generally should be no discovery or inquiry into the sort of
> "contextual" factors highlighted by the FEC and intervenors; (3) discussion
> of issues cannot be banned merely because the issues might be relevant to an
> election; and (4) in a debatable case, the tie is resolved in favor of protecting
> speech. (*WRTL* at 474, n. 7 (emphasis in original).)

In *Citizens United v. Federal Election Comm'n*, 130 S. Ct. 876 (2010), the Supreme Court addressed
the applicability of section 203(a) of the BCRA (placing restrictions on electioneering
communications) to Citizens United, a nonprofit corporation. In January 2008, Citizens
United released and planned to publicly distribute a film entitled *Hillary: The Movie ("Hillary")*,
which mentioned Senator Hillary Clinton by name and included interviews with
commentators and other persons that were quite critical of Senator Clinton. At the time,
Senator Clinton was a candidate for her party's Presidential nomination. Under federal
election law, as amended by the BCRA in 2003, corporations and unions were barred from
using their general treasury funds for express advocacy or for electioneering
communications. Citizens United sought declaratory and injunctive relief against the FEC,
arguing that the applicable provisions of federal election law prohibiting such corporate
expenditures was unconstitutional.

The Supreme Court agreed with Citizens United that the federal statutory restriction on
expenditures by corporations and unions was unconstitutional as a violation of the First

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 33 of 43

Amendment. However, the Court's initial analysis concerning whether *Hillary* qualifies as an electioneering communication is important to this discussion. Citizens United argued that *Hillary* is "just a documentary film that examines certain historical events." The Supreme Court disagreed, noting that the movie consistently emphasized the relevance of the historical events to Senator Clinton's suitability to be President, with the narrator noting in the movie's closing line:  "Finally, before America decides on our next president, voters should need no reminders of . . . what's at stake – the well being and prosperity of our nation." The Supreme Court had no trouble agreeing with the district court that:

> [T]here is no reasonable interpretation of *Hillary* other than as an appeal to vote against Senator Clinton. Under the standard stated in *McConnell* and further elaborated in *WRTL*, the film qualifies as the functional equivalent of express advocacy. (*Citizens United* at 890.)

In summary, the United States Supreme Court appears to have abandoned the stringent "magic words" test in favor of what is purported to be an objective test for express advocacy, which can be summarized as follows:

> A court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate. (*WRTL*, 551 U.S. at 469-70.)

According to the Court, while contextual factors "should seldom play a significant role in the inquiry," courts "need not ignore basic background information that may be necessary to put an ad in context . . . ." (*WRTL*, 551 U.S. at 473-74.)

**The Campaign Ads in This Case**

The test for express advocacy approved by the Supreme Court will be applied to each of the campaign flyers discussed herein. The campaign flyers described and reproduced in Facts 2 and 6, Exhibits 1, and 3 through 11, can be classified into three types – the "Trying to Trick" ads, the "Making Taxpayers Howl" ad, and the "Who's Pulling Strings" ads.

### "Trying to Trick" Ads

These ads, which are directed at Democratic state legislative candidates Hamlett, Getz, Holm, Woerner, Beck, and Steenson (Exhibits 1,4,6,7,8,and 11), all claim that the named candidate is "trying to trick" someone. The front of each ad includes at least one photo intended to depict a wolf in sheep's clothing. In the case of the ads naming Hamlett, Holm, Beck, and Steenson, the ad associates the candidate with "Montana Conservation Voters" by stating, for example:  "Brad Hamlett and Montana Conservation Voters – Trying to Trick

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 34 of 43

Cascade County." Montana Conservation Voters (MCV) is a Montana organization that describes itself on its website as the "political voice of Montana's conservation and environmental community." MCV is affiliated with the Washington D.C. based League of Conservation Voters. In the case of the ads naming Getz and Woerner, the ads claim that the named candidate is "Trying to Trick Us on Taxes." On the front of the Getz and Woerner ads, in addition to a photo of a wolf in sheep's clothing, there is a photo of a hand holding a large wad of paper money. The back of the Getz and Woerner flyers has a photo of a braying donkey, presumably representing the symbol of the Democratic Party.

The ads directed at Hamlett, Holm, Beck, and Steenson caution the reader not to be "fooled by the lies" of environmental or conservation "extremists" who are allegedly "costing Montana taxpayers and hurting our economy." These ads then seek to describe the specific candidate's purported "plan" for Montana, including a list of negative consequences that will presumably occur if the candidate is elected, such as loss of thousands of jobs, loss of disposable income, and substantial increases in a family's energy bills.

The Hamlett, Holm, Beck, and Steenson ads claim that "radical environmental groups" are "dismantling" Montana's economy, and conclude by stating: "Makes you wonder what it is about [Brad Hamlett, Michael Holm, etc.] that has Washington, D.C.-based radicals here in Montana campaigning for him."

The ads directed at Getz and Woerner ask: "Why won't [Dennis Getz, Doc Woerner] answer his 'No New Taxes' pledge?" The Getz and Woerner ads refer to an alleged "Democrats' $1.2 billion spending hike and $450 million tax hike" and ask ". . . can we afford any more politicians who refuse to come clean on taxes and spending?"

The WRTL test for express advocacy is an objective test. Applying that test, the only *reasonable* interpretation of any of the six ads described above is as an appeal to the reader to vote against the candidates named in the ads. All six ads cast the candidates in a negative light and suggest they are "trying to trick" the voters in a county (Hamlett, Holm, and Beck ads), a legislative district (Steenson ad), or "us" (Getz and Woerner ads). The Hamlett, Holm, Beck, and Steenson ads link the named candidates with "extremists" or "radical environmental groups" and suggest that there will be dire consequences for Montana and Montana families if the named candidates' "Plan for Montana" has a chance of being implemented (i.e., if the named candidate is elected). The Getz and Woerner ads claim the candidates are "trying to trick us on taxes," link the named candidates with the Democrats' alleged huge increases in taxes and spending, and ask the reader whether "we can afford" any more politicians who "refuse to come clean" on taxes and spending.

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 35 of 43

None of the ads urge the reader to contact the named candidates to discuss these issues. None of the ads suggest that the reader should do his or her own research on the issues. Unlike the ads considered by the Supreme Court in *WRTL*, the ads in this case do not focus on a legislative issue, nor do they encourage the reader to adopt a particular position on an issue. Instead, the ads focus directly on the candidates' character, qualifications, and fitness for office. (See *WRTL*, 551 U.S. at 470.) The unmistakable message, and the only reasonable message that can be understood from a plain reading of the "Trying to Trick" ads, is that the reader should vote against the candidates named in each ad.

### "Making Taxpayers Howl" Ad

This ad, which is directed at Democratic state legislative candidate Cynthia Hiner (Exhibit 5), states that "her $1.2 billion dollar tax hike is . . . making taxpayers howl." The front of the ad includes a photo depicting a wolf howling at a full moon, with clouds and lightning. The back of the campaign flyer includes a photo of Hiner with the word "Taxer" stamped prominently over her image. The ad states that Hiner "united with special interest tax and spenders to raise your taxes," claiming that she voted for $450 million in tax and fee hikes and a $1.2 billion spending increase. The ad concludes with the statement:  "Montana can't afford Cynthia Hiner as State rep."

Applying the objective test for express advocacy, the only reasonable interpretation of the "Making Taxpayers Howl" ad is as a plea to vote against Hiner.

### "Who's Pulling Strings" Ads

These ads, which are directed at Democratic state legislative candidates Paul Clark, Bill McChesney, and Lynda Moss (Exhibits 3, 9, and 10), include the following message superimposed over three images of a puppet or marionette:  "Who's pulling [Paul Clark's, Bill McChesney's, Lynda Moss'] strings??? Hint:  It's got to do with 'Green.'" The back of the flyer refers to "the radical environmentalists' puppet politician," naming the candidate. Two of the ads (Clark and Moss) associate the named candidate with "the Washington, D.C.-based 'Conservation Voters,'" which it characterizes as "a radical, left wing environmental group" that endorses the named candidate.

The McChesney ad states that "multiple left-wing so called 'environmental' groups have given high ratings to" McChesney. All three ads claim that the motive of the "front organization" is destruction, not conservation, and refer to the named candidates' individual past voting records, alleging that they voted for bills that had or would have had various negative consequences for Montana, such as loss of jobs and tax revenue, and increased fuel costs. All three ads conclude with the statement:  "Montana can't afford [Paul Clark, Bill McChesney, Lynda Moss]."

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 36 of 43

Applying the objective test for express advocacy, the only reasonable interpretation of the three Who's Pulling Strings ads is as an appeal to vote against the named candidates.

### § 13-35-225(1), MCA and the Attribution Language on the Ads

§ 13-35-225(1), MCA, requires that "(c)ommunications advocating the success or defeat of a candidate. . . through any. . . newspaper, . . . direct mailing, poster, handbill. . . or other form of general political advertising must clearly and conspicuously include the attribution 'paid for by' followed by the name and address of the person who made or financed the expenditure for the communication." If a political committee finances the communication, the attribution must include name of the committee and the committee treasurer, as well as the address of either the committee or the treasurer. *Id.*

Each flyer contains the following attribution language:

> Coalition for Energy and the Environment
> a project of Western Tradition Partnership
> P.O. Box 11894
> Bozeman, MT 59715

§ 13-35-225(1), MCA provides that in the case of a political committee the attribution language must include the words "paid for by" followed by the name of the committee, the name of the committee treasurer, and the address of the committee or committee treasurer. The attribution on all 10 flyers is deficient because it does not include the words "paid for by" and does not list the name of the committee treasurer.

In two previous decisions, I determined that although particular attribution language on campaign materials did not include the name of the committee treasurer or the words "paid for by," it was not in the best interests of the State of Montana to proceed with a civil penalty action. In both cases, I concluded that the attribution language complied in other material respects with the requirements of the statute, and the public was not deprived of information establishing who paid for the campaign materials and how that person could be contacted. (*Matter of Complaint Against Yes CI-97, Yes CI-98, and Yes I-154*, April 15, 2008 (name of committee treasurer) and *Coombs v. Bitterrooters for Planning & Citizens for Ravalli County's Future*, (Dismissal Letter) December 17, 2009 ("paid for by" language).)

For reasons discussed in more detail below, I find that this case is distinguishable. Although contact information for CEE is provided on the campaign mailers, the evidence establishes that *Western Tradition Partnership, not CEE,* was behind the creation and distribution of the mailers. The language and contact information on the mailers is deceptive, since it attributes the campaign activity to CEE.

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 37 of 43

**Requirements of § 13-35-225(3), MCA**

§ 13-35-225(3)(a)(i), MCA requires printed election materials that include information about a candidate's voting record to include "a reference to the particular vote or votes upon which the information is based." As set forth in Fact 18, four of the campaign mailers described in this decision include information about a candidate's voting record – the ads attacking Clark, McChesney, Moss, and Hiner. While the mailers pertaining to Clark, McChesney, and Moss include references to bill numbers and the year of the legislative session, they do not reference "the particular vote or votes" upon which the statement in each mailer is based. Therefore, they do not comply with the statute. The mailer directed at Hiner includes no information whatsoever disclosing the session year, bill number, or particular vote; thus, it also fails to comply with the statutory requirement.

§ 13-35-225(3)(a)(ii), MCA requires this type of election material to also disclose "contrasting votes known to have been made by the candidate on the same issue if closely related in time." However, because the mailers do not properly reference any of the candidates' particular votes, it is not possible to conclude that specific contrasting votes should have been cited. (*Matter of Complaints Against John Vincent* at page 18; Amended November 18, 2008.)

**Political Committee Registration and Reporting**

The complaint alleges that WTP sponsored the creation and mailing of the Hamlett campaign flyers, which implicitly urge the reader to not vote for Hamlett, thereby becoming a political committee that should have publicly disclosed their involvement in the election by registering and filing campaign finance reports.

CEE filed a Statement of Organization (Form C-2) as a political action committee, and filed periodic campaign finance reports (Form C-6) disclosing less than $12,000 in contributions and less than $12,000 in expenditures over an eight-month period. (Facts 38 and 45.) Nearly all of the contributions to CEE came from persons associated with CEE or WTP:

- $2,000 from Fawn Kirkpatrick, a student, who was CEE Treasurer (Facts 25 and 37)
- $5,250 from John Sinrud, one of WTP's founders (Facts 21, 37, and 45)
- $4,000 from Dan Reed, WTP's Executive Director (Facts 19 and 45)

According to the reports the bulk of the expenditures were made to Red Phone Consulting for what CEE described as "consulting and mail services." (Facts 38, 40, and 45).

In its initial response to the complaint former WTP Executive Director Dan Reed claimed that the Hamlett flyer was financed by CEE, a political action committee (PAC), and that WTP "does not control, fund, or purport to speak for any PAC." WTP also contends

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 38 of 43

that WTP did not pay for the Hamlett flyer and did not make any expenditures regulated by Montana campaign finance and practices laws. (Fact 19.) A letter responding to the complaint signed by Brian Witt, Treasurer of CEE, makes the claims that CEE paid for the Hamlett flyer, and that CEE's income and expenditures are "completely separate" from WTP. (Fact 20.)

The facts disclosed in this matter and summarized below do not support these claims. In fact, they paint a far different picture. The evidence summarized below shows that WTP and CEE are interrelated – WTP was heavily involved in the activities related to the creation and mailing of not only the Hamlett flyer but numerous other campaign flyers attacking both Republican and Democratic candidates for the Montana Legislature, some of which are reproduced in Fact 6 of this decision.

- Scott Shires filed WTP's articles of incorporation in Colorado. (Fact 24.) Shires also completed and filed IRS form 8871 for CEE, describing CEE as an IRS 527 organization, listing Shires as the manager of CEE, and listing WTP as a related, affiliated entity. (Fact 27.) Shires filed CEE's form 990-EZ tax return for the 2008 tax year as "Treasurer" of CEE, reporting no contributions or expenditures for the 2008 tax year. (Fact 28.) WTP's form 990-EZ tax return for the 2008 tax year includes "Western Tradition Partnership" in the space for the name of the organization, with "Coalition for Energy and the Environment" hand-written above it and reports total contributions for the 2008 tax year of $665,725, and total expenses of $662,415. (Fact 30.) On May 18, 2010, the Coalition for Energy and the Environment renamed itself Western Tradition Partnership on an IRS form. Both organizations have the same federal employment identification numbers. (Fact 31.)

- Shires was associated with a Colorado organization (CLT) that was penalized more than $7,000 for failing to report electioneering activities opposing Colorado local government candidate Steve Carter. (Facts 34 and 35.) The campaign flyer produced by CLT has the same format and layout – in fact, is nearly a carbon copy of the "Making Taxpayers Howl" flyer opposing Cynthia Hiner. (Facts 6 and 36.) The check used to pay for the Carter flyer listed a Livingston, Montana post office box, the mailing address in Livingston is associated with Christian LeFer, and the signature on the check appears to be LeFer's. (Facts 36.)

- CEE reported expenditures to Red Phone Consulting, a Colorado business with which Jacob Leis was affiliated. The purpose of the expenditures was described as

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 39 of 43

"consulting and mail services. Jacob Leis was listed on WTP's website in the spring of 2010 as its Executive Director. (Facts 38, 40, 45.)

– A former employee of WTP understood her duties to include getting individuals elected to public office. (Fact 47.) The former employee provided copies of WTP's PowerPoint presentations showing WTP's plans to "target" specific Montana legislative races and claiming that its preferred candidates prevailed in 14 of 19 2008 targeted races in Montana. (Facts 51 and 52.) Notes for the WTP PowerPoint presentations emphasize to prospective donors that there is no contribution limit, that donors can give as much as they want to make "as big an impact" as they wish, that their contributions will remain confidential, and that on election night donors could just "sit back" and "see what a difference" they made. (Fact 54.)

– The WTP PowerPoint presentation directed to prospective Montana donors includes examples of campaign flyers that have the same format and layout as the "Trying to Trick" flyers attacking Montana legislative candidates. (Fact 55.)

– Information provided by former CEE Treasurer Brian Witt, including email exchanges with Christian LeFer, demonstrates that WTP appears to have directed the activities of CEE and Witt. (Facts 59 – 61.)

– Flyers reported on CEE disclosure forms list incumbent Republican legislators who were targeted in the primary election by committees with which LeFer and WTP employees had direct involvement. (Facts 38, 39 and 68.)

– All of the flyers described in this decision constitute express advocacy and are therefore subject to Montana laws requiring public disclosure – identification of who is speaking, and where the money is coming from.

Montana law defines a "political committee" to include a person other than an individual who makes a contribution or expenditure to oppose a candidate. (§ 13-1-101(22)(a), MCA.) A "person" includes "a corporation, association, firm, partnership. . . or other organization. . ." § 13-1-101(20), MCA.) The evidence presented above clearly shows that WTP qualifies as a political committee under Montana law.

As a political committee, WTP was required to file a form a Statement of Organization (Form C-2) within five days after making an expenditure. (§ 13-37-201, MCA.) WTP's failure to file a Statement of Organization violates the statute. WTP was also required to file periodic reports of contributions and expenditures (Form C-6) disclosing its campaign activities. (§§ 13-37-225 and 226, MCA.) WTP's failure to file any campaign finance reports violates the statutes.

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 40 of 43

The claims that WTP does not control, fund, or speak for CEE (Facts 19 and 32), that WTP did not make any expenditures regulated by Montana campaign finance and practices laws (Fact 19), and that CEE's income and expenditures are "completely separate" from WTP (Fact 20), are belied by the evidence and are deceptive. The evidence is overwhelming that CEE was established by WTP as a sham organization to create the illusion that WTP was not directly involved in campaign activities directly opposing candidates for public office. The evidence shows that WTP's ultimate purpose in Montana in 2008 was not to discuss issues, but to directly influence candidate elections through surreptitious means.

WTP's PowerPoint presentations directed at potential donors emphasize the "confidential" nature of its fund-raising activities, that the names of contributors and the amounts of contributions need not be disclosed, and that there is "no limit" as to how much a potential donor can contribute. The presentations claim that donors can just "sit back on election night and see what a difference" they have made. (Fact 54.) The evidence shows that WTP was directly involved in virtually every move that CEE made. WTP, not CEE, provided the finances and was the primary force behind the design, creation, and distribution of the illegal campaign flyers discussed herein.

It is likely CEE's campaign finance reports do not fully disclose the amount and true source of funds used to oppose candidates. Reported contributions came only in relatively large amounts, and only from those directly associated with the committees. This raises a money laundering concern. While Montana disclosure forms list total contributions and expenditures of just under $12,000 (Facts 38 and 45), WTP's form 990-EZ tax return for the 2008 tax year, with "Coalition for Energy and the Environment" hand-written above Western Tradition Partnership, reports total contributions of $665,725, and total expenses of $662,415. (Fact 30.)

Furthermore, the campaign finance reports filed by CEE to supposedly disclose the amount, source, and disposition of funds used to oppose candidates appear to have significantly late-reported and under-reported expenditures. CEE provided 10 mailers that it claims it paid for during the 2008 election, representing contested races in 10 legislative districts. (Facts 5, 6, and 8-17.) However, WTP's PowerPoint presentation to potential donors claims that candidates who are aligned with WTP's interests ("pro-responsible growth candidates") won in "14 of 19 targeted races." (Fact 51.)

This claim by WTP finds support in the report of independent expenditures targeted at three incumbent Republican legislators in the 2008 primary election and in a letter submitted

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 41 of 43

to CPP by CEE Treasurer Brian Witt on November 10, 2008, which mentions two additional candidates for which CEE did not provide mailers to CPP – Perry Miller and Wanda Grinde. (Fact 5.) Thus, it appears that WTP and CEE were involved in far more than 10 contested elections.

Finally, it is highly unlikely that thousands of slick, oversize, full color, glossy, professionally designed and printed campaign flyers could have been mailed out to registered voters in 13 or more "targeted" Montana legislative districts for the amount of contributions and expenditures reported by CEE -- less than $12,000. Postage alone to the 76,000 registered voters in the 10 districts targeted by the general election attack ads shown in Fact 6 would cost about $9,900. (Assuming a 13 cent non-profit postage rate.) Printing costs for each of the flyers is estimated at $1,200 to $1,700, depending on the size of the district. A likely cost for printing and mailing one flyer of this type to just the 10 districts discussed in Fact 6 of this decision based on these estimates is $26,000.

Montana's Campaign Finance and Practices Act requires the "full disclosure and reporting of the sources and disposition of funds used . . . to support candidates, political committees, or issues . . . ." (Section 1, Chapter 480, Laws of 1975.) In short, the people of Montana have determined that they have an absolute right to know who is behind efforts to influence elections, how much money is being spent on those efforts, and where the money comes from.

Recently, the US Supreme Court in *Citizens United v. FEC*, 130 S. Ct. 876 (2010) reaffirmed the importance of disclosure to a well-informed electorate. The Court reasoned:

> With the advent of the Internet, prompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions. . . (c)itizens can see whether elected officials are "'in the pocket' of so-called moneyed interests." The First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages. *Citizens United*, 130 S. Ct. at 916 (internal citations omitted).

WTP's failure to register as a political committee and publicly disclose the true source and disposition of funds it used to oppose candidates for the Montana Legislature frustrates the purpose of Montana's Campaign Finance and Practices Act raises the specter of corruption of the electoral process and clearly justifies an action seeking a civil penalty.

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 42 of 43

WTP asserts that its activities do not fall within the jurisdiction of CPP. (Fact 19.) Neither WTP nor CEE has cooperated in the investigation of this matter – at this time, the full nature and extent of their campaign activities in Montana is unknown.

It is likely that a civil penalty action will be necessary to determine all the facts and documentary information related to their campaign activity. It will be necessary to question Sinrud, LeFer, Ferguson and others under oath in order to determine whether other violations may have been committed in addition to those discussed in this decision.

I'm confident a court will recognize and uphold Montana's longstanding commitment to full public disclosure of contributions and expenditures made to influence elections.

**CONCLUSION**

Based on the preceding Summary of Facts and Statement of Findings there is substantial evidence to conclude that Western Tradition Partnership and the Coalition for Energy and the Environment violated Montana campaign financial reporting and disclosure laws, and that a civil penalty action under § 13-37-128, MCA is warranted.

DATED this 21st day of October 2010.

_____
Dennis Unsworth
Commissioner of Political Practices

Decision re: Western Tradition Partnership and
Coalition for Energy and the Environment
Page 43 of 43